CENTER FOR LAW AND
EDUCATION, et al.,
Plaintiffs,

v.

UNITED STATES DEPARTMENT
OF EDUCATION, Defendant.

No. Civ.A. 02–0443(JDB).

United States District Court,
District of Columbia.

May 22, 2002.

are plaintiffs' motion for a preliminary injunction and defendant's motion to dismiss. For the reasons stated below, plaintiffs' motion for a preliminary injunction is denied and defendant's motion to dismiss is granted.

## FACTUAL AND PROCEDURAL BACKGROUND

Four of the plaintiffs are non-profit agencies that purport to represent parents and students with respect to their interests in the negotiated rulemaking process under the NCLBA. *See* Amended Compl. ¶¶ 7–10. The fifth plaintiff, Rachelle Lindsey, is a parent of a public school child.[1] *See id.* ¶ 11. Education is charged with administering the NCLBA.

The NCLBA, which was signed into law in January 2002, provides support for education programs designed to help disadvantaged children meet high academic standards. Section 1901 of the NCLBA empowers the Secretary of Education (the "Secretary") to issue regulations under Title I of the Elementary and Secondary Act of 1965, which was amended by the NCLBA. Section 1901(b) of the NCLBA, entitled "Negotiated Rulemaking Process," lays out specific procedures for the Secretary to follow in developing and promulgating the regulations. First, the Secretary is required to "obtain the advice and recommendations of representatives of Federal, State, and local administrators, parents, teachers, paraprofessionals, members of local school boards and other organizations involved with the implementation and operation of programs under [Title I]." NCLBA § 1901(b)(1). After obtaining this

Daniel A. Sasse, Crowell & Moring, L.L.P., Washington, DC, for plaintiffs.

John Russell Tyler, U.S. Dept. of Justice, Civ. Div., Washington, DC, for defendant.

### *MEMORANDUM OPINION*

BATES, District Judge.

The Center for Law and Education, Designs for Change, National Coalition for the Homeless, the National Law Center on Homelessness and Poverty, and Rachelle Lindsey (collectively, "plaintiffs") bring this action against the United States Department of Education ("Education" or "defendant") to invalidate Education's selection of participants in a negotiated rulemaking process under the No Child Left Behind Act of 2001, Pub.L. No. 107–110, 115 Stat. 1425 (2002) ("NCLBA"). Presently before the Court

---

1. Following argument on plaintiffs' motion for a preliminary injunction, the four organizational plaintiffs moved for leave to amend their complaint to add Ms. Lindsey as a plaintiff. Plaintiffs are entitled to amend their complaint "once as a matter of course" under the present circumstances. *See* Fed.R.Civ.P. 15(a). Moreover, defendant does not object to the amendment, nor does the amendment change the Court's analysis here. Accordingly, plaintiffs' motion for leave to amend is granted.

advice, but before publishing proposed regulations, the Secretary must:

(A) establish a negotiated rulemaking process on, at a minimum, standards and assessments;

(B) select individuals to participate in such process from among individuals or groups that provided advice and recommendations, including representation from all geographic regions of the United States, in such numbers as will provide an equitable balance between representatives of parents and students and representatives of educators and education officials; and

(C) prepare a draft of proposed policy options that shall be provided to the individuals selected by the Secretary under subparagraph (B) not less than 15 days before the first meeting under such process.

*Id.* § 1901(b)(3). Section 1901(b)(4) specifies that:

[s]uch process ... (B) shall not be subject to the Federal Advisory Committee Act, but shall otherwise follow the provisions of the Negotiated Rulemaking Act of 1990 (5 U.S.C. 561 et seq.).

Section 1901(b) also provides that during an "emergency situation" in which regulations must be issued within a very limited time, the Secretary may issue proposed regulations without following the negotiated rulemaking procedures. *See id.* § 1901(b)(5).

In general, final regulations under the NCLBA must be issued within 1 year of the date of the enactment of the NCLBA. *See id.* § 1901(b)(4)(A). Regulations for Sections 1111 and 1116 of the NCLBA, however, must be issued within 6 months of enactment. *See id.* § 1908.

Ten days after the NCLBA was signed into law, Education published in the *Federal Register* a notice soliciting "advice and recommendations from interested parties," and describing the negotiated rulemaking process required by the NCLBA. Request for Advice and Recommendations on Regulatory Issues, 67 Fed.Reg. 2770 (January 18, 2002). The notice specified that Education would select individuals to participate in the negotiated rulemaking process from among the individuals or groups providing advice. *See* 67 Fed.Reg. at 2771. On February 28, 2002, Education published a notice with the names of selectees for a negotiated rulemaking committee concerning "standards and assessments." *See* Notice of Meetings to Conduct a Negotiated Rulemaking Process, 67 Fed.Reg. 9223, 9223–24 (February 28, 2002). Five committee meetings were scheduled for the middle of March. *See id.* As set forth in the notice, the selectees included: six representatives of state administrators and state boards of election; four representatives of local administrators and local school boards; three representatives of principals and teachers; one representative of business interests; two representatives from Education; and seven individuals "Representing students (Including At-risk Students, Migrant Students, Limited English–Proficient Students, Students with Disabilities, and Private School Students)." *Id.* at 9224.[2] Of the seven individuals set forth as representatives of students, two were described in the notice as "parent[s]," one was identified as a "teacher," and four appeared to be state or local education officials. *See id.*

On March 8, 2002, plaintiffs filed their Complaint and a motion for a temporary

---

**2.** On March 5, 2002, Education placed a correction notice in the Federal Register adding one individual as a representative of "principals and teachers." Notice of Meeting to

Conduct a Negotiated Rulemaking Process; Correction, 67 Fed.Reg. 9935, 9936 (March 5, 2002).

restraining order seeking to halt the committee meetings on the basis that the committee was improperly constituted. Specifically, plaintiffs argued that the committee did not include "an equitable balance between representatives of parents and students and representatives of educators and education officials" as required under Section 1901(b)(3)(B) of the NCLBA. Plaintiffs asserted that, according to the notice in the *Federal Register*, there are 19 education professionals on the committee but only 2 parents. Plaintiffs challenged Education's identification of seven committee members as representing students because five of those individuals were educators or education officials.

During the second of two conference calls with the parties on March 8, 2002, this Court issued an oral ruling denying plaintiffs' motion for a temporary restraining order. The Court cited concern about its jurisdiction to hear plaintiffs' action, and noted specifically that the NCLBA (through its adoption of the Negotiated Rulemaking Act) appears to shield the negotiated rulemaking process from judicial review. An expedited briefing schedule for resolving plaintiffs' motion for a preliminary injunction was agreed to by the parties and ordered by the Court.

In their motion for a preliminary injunction, plaintiffs expand on the arguments made in their motion for a temporary restraining order. Plaintiffs assert that the NCLBA provides the representatives of parents and students with an express right to participate on the committee in an "equitable balance" with the representatives of educators and education officials. Plaintiffs cite the House Conference Report in support of their position that, to achieve a real equitable balance, the representatives of program beneficiaries (i.e.,

parents and students) should actually be the majority of the committee:

> The Conferees intend that the Secretary select individuals to participate in the Title I negotiated rulemaking in numbers that will provide an equitable balance between representatives of parents and students and representatives of educators and education officials. The Conferees do not intend this language to require strict numerical equality or comparability among these representatives. Rather, the Conferees intend the Secretary to have flexibility in selecting the conferees, while ensuring that the views of both program beneficiaries and program providers are fairly heard and considered.

H.R.Conf.Rep. No. 107–334, at 809 (2001). Plaintiffs additionally argue that the present committee is imbalanced with respect to expertise because the two parents selected for the committee lack the experience and technical knowledge possessed by the educators and education officials. What is required, plaintiffs argue, is the participation of non-governmental organizations with relevant expertise.[3]

Plaintiffs seek a preliminary injunction enjoining the negotiated rulemaking process until a new committee is appointed and prohibiting Education from using any proposed rules approved by the existing committee. *See* Amended Compl. at ¶¶ 2–3, pp. 11–12. Plaintiffs assert that, without a preliminary injunction, they will be harmed by the on-going injury to their right of participation, and that parents and students will be harmed by the risk of a final regulation that fails to account for their interests.

As discussed more fully below, defendant has moved to dismiss plaintiffs' action

---

**3.** The organizational plaintiffs note that they unsuccessfully petitioned the committee to be added as participants when the committee met on March 11, 2002.

for lack of subject matter jurisdiction on several independent grounds. Defendant also opposes plaintiffs' motion for a preliminary injunction on the grounds that the Secretary complied with his duty to establish an equitably balanced committee, that any alleged irreparable harm to plaintiffs is speculative, and that if the Court invalidates the actions of the rulemaking committee, the Secretary will have to invoke emergency authority to propose rules without the benefit of a negotiated rulemaking process.

## ANALYSIS

### I. Motion to Dismiss

Defendant moves for dismissal on several bases. First, defendant argues that plaintiffs' action is barred by Section 1901(b)(4)(B), which incorporates a prohibition on judicial review contained in Section 570 of the Negotiated Rulemaking Act of 1990, 5 U.S.C. § 561, et seq. ("NRA"). *See* 5 U.S.C. § 570. Second, defendant argues that the establishment of the negotiated rulemaking committee is not a final agency action that is subject to judicial review under the APA. Third, defendant argues that plaintiffs lack standing to pursue this action because they have suffered no injury-in-fact.

The Court finds that both the incorporation of Section 570 of the NRA and the absence of a final agency action provide

threshold jurisdictional grounds for dismissal. Accordingly, the Court need not reach defendants standing argument.[4]

### A. Bar on Judicial Review

■ Section 1901(b)(4) of the NCLBA provides:

> Process—Such process ... (B) shall not be subject to the Federal Advisory Committee Act, but shall otherwise follow the provisions of the Negotiated Rulemaking Act of 1990 (5 U.S.C. § 561, et seq.).

The NRA, in turn, provides in its Section 570 that "[a]ny agency action relating to establishing, assisting, or terminating a negotiated rulemaking committee under this subchapter shall not be subject to judicial review." 5 U.S.C. § 570. Accordingly, defendant argues, plaintiffs' claim must be dismissed because the NCLBA, by incorporating Section 570 of the NRA, precludes judicial review of the negotiated rulemaking process.

The Court agrees. Section 1901(b)(4)(B) by its plain terms states that the NCLBA negotiated rulemaking process "shall ... follow" the NRA. Congress carved out no exception for Section 570 of the NRA.[5] Moreover, there is no question that the bar on judicial review in Section 570 would apply to plaintiffs' Amended Complaint, which concerns an "agency action relating

---

**4.** Defendant argues that the organizational plaintiffs lack standing because the NCLBA grants them no right to be represented on the rulemaking committee, and that plaintiff Rachelle Lindsey lacks standing because she fails to meet the test for standing set forth in *Florida Audubon Society v. Bentsen*, 94 F.3d 658, 664 (D.C.Cir.1996) (en banc). Under *Florida Audubon Society*, in order "[t]o demonstrate standing, ... a procedural-rights plaintiff must show not only that defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause essential injury to the plaintiff[s'] own interest." *Id.*

Here, defendant argues, any alleged injury to Lindsey is entirely speculative because it can result only from the promulgation of a final rule, which is as yet undeveloped.

**5.** Notably, Congress did carve out one exception. Congress specified in Section 1901(b)(4)(B) that the NCLBA's negotiated rulemaking process would not be subject to the Federal Advisory Committee Act ("FACA"), as would ordinarily be the case under the NRA. *See* 5 U.S.C. § 565 ("[i]n establishing and administering such a committee, the agency shall comply with the Federal Advisory Committee Act ...").

to establishing ... a negotiated rulemaking committee." 5 U.S.C. § 570.

Plaintiffs resist this line of reasoning on several grounds. Their principal argument is that the NRA and NCLBA are inconsistent with one another and thus a wholesale incorporation of the NRA into the NCLBA could not have been intended by Congress. Specifically, plaintiffs point out, the NRA expressly provides an agency with a choice as to whether to engage in negotiated rulemaking, whereas the NCLBA makes negotiated rulemaking mandatory. This inconsistency can be resolved, plaintiffs maintain, by interpreting the term "[s]uch process" in Section 1901(b)(4)(B) to mean only the "process of the committee." Pl.'s Mem. in Support of Prelim.Inj. at 14. Under this interpretation, plaintiffs continue, the NRA provisions concerning the establishment of the committee are not incorporated into the NCLBA because they do not concern the "process of the committee." Likewise, the judicial review provision in Section 570 is not incorporated because it does not concern the "process of the committee."

Plaintiffs' argument appears to have some merit but is ultimately not persuasive. The terms "process" and "such process" are not defined in the NCLBA. "Such process" in Section 1901(b)(4)(B) could be understood narrowly to refer only to the "process of the committee," or, more broadly, to refer to the negotiated rule-

making process as a whole—the entire course of activities related to Education's promulgation of rules with the assistance of a negotiated rulemaking committee. An examination of the antecedent of "such process" in the NCLBA—the term "negotiated rulemaking process" in Section 1901(b)(3)(A)—does not fully resolve the issue. Section 1901(b)(3)(A) requires the Secretary to "establish a negotiated rulemaking process on, at a minimum, standards and assessments." Hence, "negotiated rulemaking process" in Section 1901(b)(3)(A) seems to refer to the concept of negotiated rulemaking in a broad and general sense; nonetheless, "negotiated rulemaking process" could arguably be understood in this context to refer more narrowly to the "process of the committee" that Section 1901(b)(3)(A) directs the Secretary to put in motion.

Any possible lack of clarity is resolved, however, by considering the implications of plaintiffs' theory.[6] Specifically, plaintiffs' approach requires that, in order for Education to determine which provisions of the NRA must be followed, Education must identify those NRA provisions concerning the "process of the committee." But the NRA is not segregated into "process" and "non-process" provisions. Nor does its language place any special emphasis on provisions governing the "process of the committee." Indeed, although plaintiffs

---

**6.** In a recent decision, *United States v. Wilson*, 290 F.3d 347, 352, 354 (D.C.Cir.2002), the D.C. Circuit discussed the rules for statutory interpretation. Analysis begins with the language of the statute. *See id.* at 352. If the language " 'has a plain and unambiguous meaning with regard to the particular dispute in the case ... [the] inquiry must cease....' " *Id.* (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)). Plainness or unambiguity is to be decided by examining " 'the language itself, the specific context in which that language is used, and the broader context of the statute as

a whole.' " *Id.* (quoting *Robinson*, 519 U.S. at 341, 117 S.Ct. 843). Once an expression is found ambiguous, a court should "consider the broader context of [the provision] and the structure of the [act] as a whole, as well as the contextual background against which Congress was legislating, including relevant practices of the Executive Branch, which presumably informed Congress's decision, prior legislative acts, and historical events." *Id.* at 354. The court should finally "explore the policy ramifications of the suggested interpretation of [the provision]." *Id.*

repeatedly assert that only NRA terms concerning the "process of the committee" are incorporated, plaintiffs' papers include little substantive discussion of what they mean by "process of the committee." Plaintiffs' few examples provide inadequate guidance, and plaintiffs avoid addressing the hard cases; they do not discuss, for example, whether the NCLBA incorporates the NRA provisions at the margin of "process" nor do they address the anomalies that arise from application of their theory.[7] It is implausible that Congress, merely by using the words "such process," intended that Education undertake the difficult, if not inevitably inconclusive, task of identifying which NRA provisions concern the "process of the committee" and therefore must be followed. Plaintiffs attach more importance and nuance to the words "such process" than the context reasonably warrants.

The Court also notes that incorporation of Section 570 into the NCLBA is entirely consistent with NCLBA's rapid time frame for agency rulemaking. Regulations under the NCLBA must be promulgated within as few as six months. See NCLBA § 1908. Were legal challenges allowed to on-going negotiated rulemaking under the NCLBA, Education would be hard-pressed to meet the statutory deadlines.[8]

Admittedly, there is some inconsistency between the NCLBA and the NRA with respect to the voluntariness of negotiated rulemaking. But this inconsistency (which does not concern any provision at issue here) does not entitle the Court to read into the NCLBA and the NRA an artificial distinction between "process" and "non-process" provisions. The better reading of Section 1901(b)(4)(B) is that all terms of the NRA are to be incorporated except those that are inconsistent with the NCLBA, and those which are expressly exempted.

Plaintiffs' second challenge to the incorporation of the bar on judicial review is purportedly based on the "express language" of Section 570 of the NRA. Plaintiffs point out that Section 570 precludes judicial review with respect to "a negotiated rulemaking committee under this sub-

---

7. For example, Section 565 is entitled "Establishment of committee," and thus would presumably not be incorporated under plaintiffs' theory because it relates to committee "establishment" not committee "process." Pl's Mem. in Support of Prelim.Inj. at 15. But subsection (c) of Section 565 does not in fact relate to the establishment of the committee; it states that the "agency shall provide appropriate administrative support to the negotiated rulemaking committee, including technical assistance." Availability of administrative support would seem to be essential to the committee's "process" and thus part of the "process of the committee" even if it does not constitute "process" **by** the committee. Perhaps, therefore, under plaintiffs' theory, subsection (c) would be incorporated into the NCLBA despite the title of Section 565. Indeed, it would be difficult for plaintiffs to argue why Congress would not have wanted Education to provide administrative support to the negotiating committee.

Subsection (b) of Section 565 directs the agency to limit membership on the committee to 25 members (unless the agency head determines that a greater number is necessary), and requires participation by an agency representative. Under plaintiff's theory, this subsection would not be incorporated because it relates to committee "establishment." But the subsection appears to provide guidance relevant to the Secretary's duty to constitute a committee under the NCLBA and the Court does not see why Congress, in promulgating the NCLBA, would not have wanted the secretary to follow this provision.

8. Notably, it is precisely such a concern with delay that animated the bar on judicial review in the NRA itself. See S.Rep. No. 101–97, 101st Cong. 1st Sess., at 28 (Aug. 1, 1989) (the bar on judicial review "allows agencies to use the negotiated rulemaking process without the delays and procedural problems that might otherwise arise if judicial review of intermediate agency actions were available").

chapter"—i.e., under the NRA. Because the negotiated rulemaking committee here was established "under" the NCLBA, not the NRA, plaintiffs assert that Section 570 cannot apply. To substantiate this argument, plaintiffs speculate that the bar on judicial review was provided as a carrot to encourage agency use of negotiated rulemaking under the NRA. That incentive is unnecessary here because negotiated rulemaking is mandatory under the NCLBA, and therefore plaintiffs suggest that barring judicial review would be inappropriate.

Plaintiffs' argument is without merit. The phrase "under this subchapter" is scattered throughout the NRA. *See, e.g.,* 5 U.S.C. §§ 562(2), 566(a), 566(e), and 568(a)(1). Indeed, some of the NRA provisions that refer to negotiated rulemaking committees "under this subchapter" are exactly the same provisions that plaintiffs contend were incorporated under their "process" theory discussed above. Plaintiffs argue, for example, that Section 566, which concerns "[c]onduct of committee activity" was intended to be incorporated because it is a "process" provision that is "fundamental to the efficient functioning of negotiating committees." Pl.'s Mem. in Support of Prelim.Inj. at 14. But subpart (a) of Section 566, which discusses the duties of a committee and its obligation to attempt to reach consensus, states that it pertains to "[e]ach negotiated rulemaking committee established under this subchapter." Likewise, plaintiffs argue that "one of the most important aspects of the 'process' of the committee is the definition of . . . consensus" provided in Section 562(2). *Id.* But Section 562(2) states that it relates to a "negotiated rulemaking committee established under this subchapter." Under plaintiffs' approach, then, these "process" provisions would not apply to the NCLBA negotiated rulemaking committee since it was not established under the NRA. Thus plaintiffs' "express language" argument is

fundamentally inconsistent with, and directly undermines, plaintiffs' "process" argument.

But even in the absence of this inconsistency, the Court would not be persuaded by plaintiffs' position. Plaintiffs have come forth with no rationale to explain why Congress would have intended a scatter-shot incorporation of the NRA that excluded each provision containing the phrase "under this subchapter." The Court also does not believe that the words "under this subchapter" have any special importance under Section 570 that they do not have elsewhere. Like their "process" challenge, plaintiffs' challenge based on the "under this subchapter" language leads to an irrational structure and result.

Plaintiffs' final challenge is that allowing the negotiated rulemaking process in the NCLBA to escape judicial review would undermine Congress's intent in mandating certain aspects of negotiated rulemaking under the NCLBA. Plaintiffs bolster this argument, and indeed all of their arguments, with the proposition that there is a "strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986).

In *Bowen,* the Supreme Court indeed noted that administrative action is presumptively reviewable. But the Court went on to explain that "[t]he presumption of judicial review is, after all, a presumption, and 'like all presumptions used in interpreting statutes, may be overcome by,' *inter alia,* 'specific language or specific legislative history that is a reliable indicator of congressional intent,' or a specific congressional intent to preclude judicial review that is fairly discernable in the detail of the legislative scheme.' " *Id.* at 673, 106 S.Ct. 2133 (quoting *Block v. Community Nutrition Instit.,* 467 U.S. 340, 349, 351, 104 S.Ct. 2450, 81 L.Ed.2d 270

(1984)). Here, Congress unmistakably precluded judicial review in a separate statute that has been expressly and unequivocally incorporated into the NCLBA. This incorporation evidences a "fairly discernible" intent by Congress to withhold judicial review in cases such as this one, and plaintiffs' strained readings of the NCLBA and the NRA do not persuade the Court otherwise.

Moreover, any presumption that administrative action is reviewable would generally attach only to final agency action. *See* 5 U.S.C. § 704. As discussed below, the Court does not believe there is final agency action here. Accordingly, the Court finds that Section 570 of the NRA, as incorporated into the NCLBA under its Section 1901(b)(4)(B), bars judicial review at this time.[9]

## B. Final Agency Action

■ Even if Section 570 were not among the provisions of the NRA incorporated into the NCLBA, plaintiffs' claims

9. The Court need not reach the question whether Section 570 precludes a party from challenging even a final rule on the basis of a procedural defect occurring during "agency action establishing, assisting, or terminating a negotiating rulemaking committee." 5 U.S.C. § 570. The parties did not brief this issue, but when asked during a hearing, counsel for defendant suggested (without having researched or previously considered the question) that Section 570 bars not only intermediate review of actions relating to negotiated rulemaking, but also review based on such a defect once a final rule is in place. The Seventh Circuit, the only court that has even remotely addressed the issue, suggested in dicta that Section 570 may be an eternal bar on judicial review. *See USA Group Loan Services, Inc. v. Riley,* 82 F.3d 708, 714 (7th Cir.1996) ("The servicers argue that the Department negotiated in bad faith with them. Neither the 1992 amendment [to the Higher Education Act] nor the Negotiated Rulemaking Act specifies a remedy for such a case, and the latter act strongly implies there is none. 5 U.S.C. § 570.").

It can be argued, however, that Section 570 bars judicial review only prior to final agency action, typically the promulgation of the final rule. The language of Section 570 bars judicial review of "agency action relating to establishing, assisting or terminating a negotiated rulemaking committee," which seems to prevent review only of a limited category of (non-final) agency actions. The Senate Report relied upon by defendant confirms that Section 570 "allows agencies to use the negotiated rulemaking process without the delays and procedural problems that might otherwise arise if judicial review of intermediate agency actions were available." *See* S.Rep.

No. 101–97, at 28. Thus the purpose of the provision does not appear to have been to preclude judicial review altogether, but only during the course of the rulemaking process. Moreover, Section 570 itself makes clear that parties are not to be deprived of the remedies they would normally have with respect to a final rule: "Nothing in this section shall bar judicial review of a rule if such judicial review is otherwise provided at law." 5 U.S.C. § 570. The Senate Report elaborates:

... Persons wishing to challenge a rule derived from the work of a negotiated rulemaking committee would retain all rights they presently possess under the APA to obtain judicial review of that rule.

S. 303 recognizes and maintains the long tradition in federal administrative law which authorizes judicial review of agency rules at the time those rules are promulgated. The bill merely precludes judicial intervention in the earlier stages of the regulatory process, when a negotiated rulemaking is underway. The bill precludes this judicial intervention, not to prevent courts from taking a hard look at an agency's rules, but to allow federal agencies the freedom of action needed to make decisions and take actions which will allow the negotiated rulemaking process to work.

*Id.* at 28–29 (emphasis added). Given Congress's primary concern with interrupting the administrative process, as well as Congress's recognition of the APA's grant of a right to judicial review of a final rule (including, presumably, the right in 5 U.S.C. § 704 to challenge a final rule based upon a procedural violation), it seems likely that Congress did not intend in Section 570 to shield the negotiated rulemaking process from judicial review even after a final rule.

would still not be reviewable. Plaintiffs have brought their Amended Complaint under the judicial review provisions of the APA, 5 U.S.C. §§ 701–06. Section 704 of the APA "permits review only of 'final agency action.'" *Public Citizen v. Office of United States Trade Representatives,* 970 F.2d 916, 918 (D.C.Cir.1992) (quoting 5 U.S.C. § 704). The " 'requirement of a final agency action has been considered jurisdictional. If the agency action is not final, the court therefore cannot reach the merits of the dispute.'" *Funding Corp. v. Sec'y of HUD,* 76 F.3d 1212, 1214 (D.C.Cir. 1996) (internal citation omitted).

There are various tests for determining whether agency action is final. One test is "whether the agency's position is 'definitive' and whether it has a 'direct and immediate ... effect on the day-to-day business' of the parties." *Independent Petro. Assoc. of Am. v. Babbitt,* 235 F.3d 588, 594 (D.C.Cir.2001) (citations omitted). Another is whether the action "mark[s] the consummation of the agency's decisionmaking process" and is "one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear,* 520 U.S. 154, 178, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal quotations and citations omitted).

There has not been a final agency action here. The rulemaking process at issue is at an intermediate stage. The proposed rules have only recently been published. *See* Proposed Rules, 67 Fed.Reg. 30452 (May 6, 2002). Education will shortly be reviewing comments from interested members of the public, and Education also plans several regional meetings at which individuals will have the opportunity to provide input. *See* Notice of Meetings to Solicit Public Comment on Proposed Regulations, 67 Fed.Reg. 30461 (May 6, 2002). Only after completion of this process will final rules be published. It is the final rule which will "mark the consummation of

the agency's decisionmaking process" and set forth the agency's "definitive" position." *See Bennett,* 520 U.S. at 178, 117 S.Ct. 1154; *Independent Petro.,* 235 F.3d at 594. The final rule, not the selections for the negotiated rulemaking committee or even the actions of that committee, will determine the rights and obligations of students and parents with respect to the "standards and assessments" that are the subject of the rulemaking. At the present time, plaintiffs cannot even be sure that their interests will be adversely affected by the final rules that will be promulgated. *See DRG Funding Corp.,* 76 F.3d at 1215 ("When completion of an agency's processes may obviate the need for judicial review, it is a good sign that an intermediate agency decision is not final.").

Plaintiffs dispute this line of reasoning, arguing that it mischaracterizes the agency action that they are challenging. They assert that they are not complaining about the substance of any anticipated final rule; instead, their complaint is that their exclusion from the negotiated rulemaking committee infringes their right "to participate in the process of developing the proposed rule." Pl.'s Reply Mem. in Support of Prelim.Inj. at 5 (emphasis omitted). Accordingly, plaintiffs contend, the final agency action at issue is the Secretary's determination of the membership of the negotiated rulemaking committee. This determination, plaintiffs assert, represented the completion of the agency's decisionmaking process about committee membership and directly affected plaintiffs' rights to participate.

In support of this position, plaintiffs cite a handful of purportedly "analogous actions" under FACA. The Eleventh Circuit upheld a permanent injunction against an agency's use of an administrative committee report in a rulemaking context because, among other things, the committee

was not fairly balanced as required under FACA, 5 U.S.C.App. 2 § 5. *Alabama–Tombigbee Rivers Coalition v. Dep't of Interior,* 26 F.3d 1103, 1107 (11th Cir. 1994). Similarly, a district court enjoined two advisory committees from meeting until the agency appointed additional members to ensure that the committees were fairly balanced under FACA. *Northwest Ecosystem Alliance v. Office of the United States Trade Representative,* No. C99–1165R, 1999 USDist. Lexis 21689, at *29–30 (W.D.Wash.1999); *see also Cargill, Inc. v. United States,* 173 F.3d 323, 337 (5th Cir.1999) (reaching the merits of a complaint that an advisory committee was not fairly balanced); *Nat'l Anti–Hunger Coalition v. Executive Comm.,* 711 F.2d 1071, 1074 n. 2 (D.C.Cir.1983) (when the "fairly balanced" requirement is ignored, "persons having a direct interest in the committee's purpose suffer injury-in-fact sufficient to confer standing to sue"). Because the courts in those cases found that the selection of members for an advisory committee was judicially reviewable, so, too, plaintiffs argue, should this Court hear plaintiffs' allegations about membership in the NCLBA committee.

Plaintiffs' theory, although intriguing, is not persuasive. Plaintiffs concede that, outside of the FACA context, they cannot identify any case in which a court has found jurisdiction prior to the publication of a final rule to review an agency's administrative rulemaking process based on an alleged procedural flaw. This Court is loathe to find that an agency's alleged procedural misstep can become immediately reviewable as a final agency action before promulgation of the final rule just because a plaintiff conceptualizes its injury

so that it appears to result from the intermediate procedural decision. Permitting mid-stream review based on alleged injuries of this sort would disrupt the agency's process and subject the courts to inefficient piecemeal review of agency rulemaking. *See DRG Funding Corp.,* 76 F.3d at 1214 (the requirement of a final agency action "avoids disrupting the agency's processes, and ... relieves the courts from having to engage in 'piecemeal review which is at the least inefficient and upon completion of the agency process might prove to have been unnecessary' " (citation omitted)).

The Court recognizes that Congress has specified that the Secretary must convene a negotiated rulemaking committee, and that Congress has identified parameters for the composition of that committee. That does not, however, warrant the conclusion that Congress intended to allow judicial interference in Education's rulemaking process prior to the promulgation of a final rule.[10] All rulemaking efforts are subject to procedural requirements, often set forth in mandatory terms in the underlying statute; nonetheless, there is a salutary purpose to reserving judicial review until there is final agency action in the form of a final rule.

Plaintiffs' reliance on cases concerning the "fairly balanced" requirement under FACA is not compelling. As an initial matter, Congress expressly exempted NCLBA negotiated rulemaking committees from the requirements of FACA. Section 1901(b)(4)(B) of the NCLBA states that the negotiated rulemaking process "shall not be subject to the Federal Advisory Committee Act." Moreover, the

---

**10.** The Court notes that plaintiffs have not argued that the Secretary's selection of the committee members constitutes recalcitrance in the face of duty, which is immediately reviewable by a district court. *See Sierra* *Club v. Thomas,* 828 F.2d 783, 793 (D.C.Cir. 1987). In any event, the Court would not find such an allegation meritorious here, where the Secretary's actions do not constitute a clear violation of a statutory duty.

FACA cases cited by plaintiffs are of questionable authority, as several judges in this Circuit have concluded that they lacked jurisdiction to hear challenges to the "fairly balanced" requirement. *See Public Citizen v. Nat'l Advisory Comm. on Microbiological Criteria for Foods*, 886 F.2d 419, 426 (D.C.Cir.1989) (split panel in which one judge found that a challenge to the "fairly balanced" requirement was not justiciable and that plaintiff lacked standing); *Fertilizer Instit. v. United States EPA*, 938 F.Supp. 52 (D.D.C.1996) (challenge to the "fairly balanced" requirement was not justiciable and plaintiff lacked standing) *Public Citizen v. Dep't of Health & Human Services*, 795 F.Supp. 1212 (D.D.C. 1992) (same); *see also Sanchez v. Pena*, 17 F.Supp.2d 1235 (D.N.M.1998) (challenge to the "fairly balanced" requirement was not justiciable); *Doe v. Shalala*, 862 F.Supp. 1421 (D.Md.1994) (same). Notably, in none of the cases that plaintiffs cite did a court expressly consider whether it had been presented with a final agency action.

In any event, the FACA cases are not sufficiently analogous to plaintiffs' action to be persuasive. FACA's principal purpose was to establish procedures aimed at enhancing public accountability of federal advisory committees. *See Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 446, 459, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989); *Washington Legal Foundation v. United States Dep't of Justice*, 691 F.Supp. 483, 490 (D.D.C.1988) (purpose of FACA is to open to public scrutiny the manner in which the government obtains advice from private individuals). Thus an offense under FACA inheres mainly in the procedural defect itself, not in the effects those defects have on the substantive work product of the committee. In addition, FACA does not anticipate that there will be a uniform end-point to the committee's

work, such as the promulgation of a final agency rule. Hence, under FACA, a court could view a procedural violation as ready for review at the time it is committed.

The NCLBA, in contrast, is about education. It aims to ensure that all children have access to high-quality education and reach minimum proficiency on challenging academic achievement standards. *See* NCLBA § 1001. Although the NCLBA requires the Secretary to achieve an "equitable balance" on a negotiated rulemaking committee, the establishment of that committee is but a step in the rulemaking process directed by the NCLBA, and is incidental to the NCLBA's primary purpose of enacting substantive education reform. Even assuming that plaintiffs were harmed by their exclusion from the rulemaking committee, the principal injury cognizable under the NCLBA would arise out of the promulgation of a final rule. Thus, this case does not present any reason to depart from the bar that the APA normally places on judicial review prior to a final rule.

Accordingly, both because there has not yet been final agency action that is reviewable and because incorporation of Section 570 of the NRA into the NCLBA bars judicial review of plaintiffs' claims at this time, Education's motion to dismiss is granted.

## II. Preliminary Injunction

Even if plaintiffs' action were not properly dismissed, plaintiffs' motion for a preliminary injunction should be denied. Plaintiffs have not carried their burden under the familiar four-factor test for extraordinary injunctive relief.[11]

---

**11.** Although the reasons for denial of plaintiffs' motion for a preliminary injunction are set out fully here, the motion will be denied as moot in light of the dismissal of this action.

## A. Standard for Preliminary Injunction

■ In order to prevail on their motion, plaintiffs must demonstrate (1) a substantial likelihood of success on the merits; (2) that they will suffer irreparable harm absent the relief requested; (3) that other parties will not be harmed if the requested relief is granted; and (4) that the public interest supports granting the requested relief. *Taylor v. Resolution Trust Corp.,* 56 F.3d 1497, 1505–06 (D.C.Cir.1995); *Washington Area Metro. Transit Comm'n v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977). In determining whether to grant urgent relief, the Court must "balance the strengths of the requesting party's arguments in each of the four required areas." *CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 747 (D.C.Cir.1995). "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak." *Id.*

It is particularly important for plaintiffs to demonstrate a substantial likelihood of success on the merits. *Morgan Stanley DW Inc. v. Rothe,* 150 F.Supp.2d 67, 73 (D.D.C.2001). Where a plaintiff cannot show a likelihood of success on the merits, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor." *Davenport v. Int'l Brotherhood of Teamsters, AFL—CIO,* 166 F.3d 356, 367 (D.C.Cir.1999).

■ Because preliminary injunctions are extraordinary forms of judicial relief, courts should grant them sparingly. *See Morgan Stanley DW,* 150 F.Supp.2d at 73. "As the Supreme Court has said, '[i]t frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Id.* (quoting *Mazurek v. Armstrong,* 520 U.S.

968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997)).

## B. Likelihood of Success on the Merits

Plaintiffs have not demonstrated a substantial likelihood of success on the merits of their claim. As plaintiffs acknowledge, the Secretary's selection of the committee members can only be overturned if it is arbitrary, capricious, or otherwise in violation of law. *See* Amended Compl. ¶ 27. "A party seeking to have a court declare an agency action to be arbitrary and capricious carries 'a heavy burden indeed.'" *Wisconsin Valley Improvement Co. v. Fed. Energy Regulatory Comm'n,* 236 F.3d 738, 745 (D.C.Cir.2001) (citation omitted).

As described by Education, the committee included six representatives of state education officials, four representatives of local education officials, four representatives of principals and teachers, one representative of business interests, two representatives from Education, and seven representatives of students. *See* 67 Fed. Reg. at 9224; 67 Fed.Reg. at 9935. Thus, under Education's calculation, there are 14 representatives of state and local educators and education officials and 7 representatives of students.

■ Plaintiffs' contention that a **majority** of the negotiating committee must be comprised of representatives of parents and students is unconvincing. Section 1901(b)(3)(B) only requires an "equitable balance" between representatives of parents and students and representatives of educators and education officials. "Equitable balance" does not mean "equal number," nor does it mean that one group must have more representatives than the other. The House Conference Report that plaintiffs cite provides no support for their position, and indeed states that "[t]he Conferees do not intend ... to require strict numerical equality or compar-

ability among these representatives." H.R.Conf.Rep. No. 107–334, at 809. It also explains that "the Secretary [should] have flexibility in selecting the conferees." *Id.* The Court is thus not persuaded that, given this deferential standard, a committee with 14 representatives of one group and 7 representatives of another group is *per se* not equitably balanced.

■ Nor is plaintiffs' allegation that there are actually only two representatives of parents and students on the committee ultimately persuasive. In the February 28, 2002, notice in the *Federal Register*, Education identified the following individuals as "Representing students (Including At-risk Students, Migrant Students, Limited English–Proficient Students, Students with Disabilities, and Private School Students)":

Tasha Tillman, parent, Colorado Springs (CO).

Minnie Pearce, parent, Detroit (MI).

Arturo Abarca, teacher, Helitrope Elementary School, Los Angeles Unified School District (CA).

Maria Seidner, Director, Bilingual Education, Texas Education Agency.

Dr. Alexa Pochowski, Associate Commissioner, Kansas Department of Education.

Myrna Toney, Director of Migrant Education, Wisconsin Department of Education.

John R. Clark, Assistant Superintendent, Department of Education, Diocese of Allentown (PA).

67 Fed.Reg. at 9224. The Court does not agree with plaintiffs that the latter five individuals should be counted as educators or education officials simply because they are employed by schools or state or local education agencies. An individual's employment or experience as an educator and education official does not necessarily preclude him or her from **representing** the interests of parents and students. Even if,

as plaintiffs argue, such an individual would ordinarily be sympathetic to the mission of educators/education officials or their views on government regulation, this does not mean that the individual could not sufficiently detach himself from that perspective (assuming he or she held it) to represent the interests of parents and students.

Moreover, plaintiffs have come forward with no evidence to rebut Education's argument that it believed when it made the selections that the five individuals at issue were well-suited to serve as representatives of students. Christine O. Wolfe, Counselor to the Deputy Secretary of the Department of Education, explains that Education "was extremely mindful" of the equitable balance requirement, and "carefully considered the topics to be negotiated and how best to represent the interests of parents and diverse groups of students with respect to the technical issues raised by these topics." Declaration of Christine O. Wolfe ¶ 6. Education paid particular attention to language from the NCLBA's legislative history suggesting that Education obtain advice and recommendations from representatives of special populations of students, such as migrant students, limited English proficient students, and homeless students. *Id.* Education also believed that it was important to represent the interests of students with disabilities and private school students receiving Title I services. *Id.*

According to Ms. Wolfe, Education concluded that

... students, particularly limited English proficient students, students with disabilities, and migrant students, could be best represented on the specific issues under negotiation by individuals who had expertise in developing standards and assessments for special populations, sensitivity to the needs of these populations, and experience in advocat-

ing the needs of these students with reference to standards and assessments within state and local education systems. [Education] believed that such individuals' perspectives and personal experiences in addressing the educational needs of these children with reference to the topics to be negotiated made them far more capable than lobbying and advocacy groups to represent the interests of students.

*Id.* ¶ 7. Accordingly, Education selected each of the five individuals at issue to represent a "group[ ] of students commonly served by Title I—at risk, limited English proficient, and migrant students, students with disabilities, and private school students." *Id.* Ms. Wolfe provides a brief biography of each of the five selectees, and identifies why Education believed that each was qualified to represent the interest of students in one of the identified groups. *Id.*

Ms. Wolfe also addresses plaintiffs' argument that educators and education officials cannot adequately represent the interests of parents and students:

It was our considered judgment that the experience of these individuals as teach-

ers or holding other educational positions did not disqualify them from speaking to the needs of the students on their behalf. Their considerable experience in speaking to and advocating for the needs of these specific groups of students in the context of state and local programs justified designating them as representatives of students rather than as representatives of educators.

*Id.* The statute, of course, only requires "equitable balance between **representatives** of parents and students," on the one hand, and "**representatives** of educators and education officials" on the other. Plaintiffs' approach would create two distinct camps and preclude, for example, an educator from being a **representative** of parents and students. The statute does not compel that cramped conclusion, which Education reasonably rejected.[12]

Based on this record, plaintiffs have not demonstrated a substantial likelihood of success. It is apparent that Education arrived at its selections by applying its expertise and considering relevant factors. It does not appear that Education's decision was so erroneous as to allow the Court to second-guess that decision.[13] *See*

12. Plaintiffs seek refuge in language from the House Conference Report noting that the Secretary should "ensur[e] that the views of both program beneficiaries and program providers are fairly heard and considered." H.R.Conf.Rep. No. 107–334, at 809. But nothing in this language requires that representatives of parents and students be drawn from a field that excludes educators or education officials who are experienced in advocating on behalf of parents and students. Nor does the Court find persuasive the recent letter submitted by plaintiffs from Senators Edward M. Kennedy and Jack Reed, stating that "Congress specifically intended to include the representatives of parents and students on the panel as separate from the educators and education officials." Pl.'s Reply in Support of Motion to Amend, Ex. 1. To the extent this letter is even persuasive evidence of Congress's intent, it indicates only that

some of the individuals on the negotiating committee should be assigned the sole task of representing parents and students—i.e., that the representation of parents and students cannot be accomplished merely by assigning some individuals dual roles as representatives of educators/education officials and as representatives of parents/students. According to Education, the five individuals at issue here were not wearing multiple hats; they were charged with the unitary responsibility to represent parents and students.

13. The Court does not find particularly compelling plaintiffs' allegation that the two "parents" on the committee, Ms. Pearce and Ms. Tillman, were not able to be effective advocates due to their inexperience and lack of expertise. Even if true, this would only confirm the reasonableness of Education's decision to include as representatives of students

*Wisconsin Valley,* 236 F.3d at 745 (a court may "not substitute [its] judgment for that of the agency, but will examine only 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment,' whether the agency's policy choice is supported by 'substantial evidence,' and 'whether there is a rational connection between the facts and the choice made'" (citations omitted)).[14] In short, plaintiffs have not made a convincing case that Education was arbitrary and capricious or plainly violated the NCLBA in its selection of representatives for the committee.

## C. Irreparable Harm to Plaintiffs

■ Plaintiffs allege that in the absence of a preliminary injunction, they will be irreparably harmed by the promulgation of a final agency rule on standards and assessments that does not reflect the views of parents and students. At this time, however, there is no final agency rule. As noted above, the proposed rules have only recently been published. *See* 67 Fed.Reg. at 30452. Education will be reviewing comments from interested members of the public, and also plans to conduct several regional meetings during which individuals will have the opportunity to provide input. *See* 67 Fed.Reg. at 30461. Thus, even if plaintiffs have objections to the proposed rules, there is an opportunity to voice those objections and they cannot be certain that their objections will not be addressed before publication of the final rule.

The Court finds it plausible that the substance of the final rules will in some measure be affected by the membership on the negotiating committee. But the extent of any adverse effect of any final rule on parents and students (or their representatives) remains at this time wholly speculative. Hence, it is not the type of concrete, immediate harm warranting extraordinary injunctive relief. *See Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n,* 758 F.2d 669, 674 (D.C.Cir.1985) (the alleged injury must be certain and of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm). Moreover, nothing in the NCLBA deprives plaintiffs of any right to challenge the substance of the final rule once it is promulgated. *See* 5 U.S.C. § 570 (final rule that is a product of negotiated rulemaking is not entitled to any greater deference by a court than other rules). Thus the Court does not assign great weight to plaintiffs' claim of irreparable harm.[15]

## D. Harm to Others and the Public Interest

■ Defendant argues, on the other hand, that a preliminary injunction will result in harm to Education and to the public. Defendant points out that the NCLBA requires that regulations under its Sections 1111 and 1116, which apply here, must be promulgated by not later than July 8, 2002. *See* NCLBA § 1908; Declaration of Joseph Johnson ¶ 4. Defendant has submitted a declaration from an Education official detailing the months of

---

five individuals with technical expertise and advocacy experience. It does not mean that Education was required to staff the committee with representatives of non-profits such as plaintiffs.

**14.** The Court notes that the substantial concerns about jurisdiction discussed in Part I above provide additional strong reasons why

plaintiffs are not likely to succeed on the merits of their claims.

**15.** It is not clear whether plaintiffs are alleging that their exclusion from the committee constitutes irreparable harm separate and apart from any final rule that might be issued. Such an alleged harm is not, in the Court's view, of a compelling dimension.

effort that have been put into the rulemaking process so far, and concluding that it would be impossible to conduct another negotiated rulemaking session and still issue final regulations by July. *See* Johnson Dec. ¶ 11. If the Court grants an injunction, defendant therefore argues, the Secretary's inability to conduct a new negotiated rulemaking session by the statutory deadline will force the Secretary to issue regulations pursuant to his emergency authority and forgo any negotiated rulemaking process. *See* NCLBA § 1901(b)(5). Alternatively, Education asserts, if the Secretary does not use his emergency authority but rather chooses to violate the July 8, 2002 deadline, final regulations will not be promulgated quickly enough to enable state and local officials to comply with Title I requirements in time for the 2002–2003 school year. *See* Johnson Dec. ¶¶ 5–7.

Plaintiffs challenge defendant's position, arguing that "[l]itigation over the final rules after their promulgation would be far more disruptive of program implementation than any relatively brief delay resulting from addressing" plaintiffs' challenge to the selection of the committee members. Pl.'s Reply Mem. at 26. Plaintiffs also point out that the actual amount of rulemaking that needs to be done before the beginning of the 2002–2003 school year is more limited than defendant suggests.

The Court is persuaded that requiring the recommencement of the negotiated rulemaking process would likely push Education beyond the July 8, 2002, deadline for promulgating final rules. The Court tends to agree with defendant that if the Secretary must use his NCLBA emergency authority to promulgate a rule without the negotiated rulemaking process, the public will be worse off.[16] The Court is

also reluctant to subject the Secretary to a violation of the July 8, 2002, deadline by requiring the negotiated rulemaking process to be re-started. Moreover, even plaintiffs concede that school officials need guidance on at least one issue prior to the 2002–2003 school year, a time frame that may be difficult for Education to meet if the negotiated rulemaking process has to begin anew. Accordingly, notwithstanding plaintiffs' conjecture that re-constituting the negotiated rulemaking committee will head-off litigation after the promulgation of the final rule, the Court concludes that the harm to other parties and to the public weighs somewhat against granting the preliminary injunction plaintiffs seek.

### E. Balancing the Factors

The Court concludes that plaintiffs have not met their burden under the four-factor test. Plaintiffs are not substantially likely to succeed on the merits of their claims. In addition, the irreparable harm to plaintiffs is largely speculative, while consideration of the harm to others and the public interest supports denying an injunction at this time. Accordingly, the Court concludes that plaintiffs would not be entitled to a preliminary injunction, even absent the persuasive grounds for dismissal of this action discussed in Part I above.

### CONCLUSION

For these reasons, plaintiffs' motion for leave to amend the complaint is granted, defendant's motion to dismiss is granted, and plaintiffs' motion for a preliminary injunction is denied as moot.

A separate order has been issued on this date.

---

**16.** This conclusion, of course, turns on the assumption implicit to the NCLBA that a negotiated rulemaking process will lead to a better rule than any rulemaking accomplished pursuant to the Secretary's "emergency" powers.

## *ORDER*

Upon consideration of Plaintiffs' Motion to Amend the Complaint, Plaintiffs' Motion for a Preliminary Injunction, and Defendant's Motion to Dismiss, the various submissions of the parties, and the arguments at the hearing on May 3, 2002, it is hereby

ORDERED that plaintiffs' motion to amend be and hereby is GRANTED for the reasons stated in the Court's Memorandum Opinion issued on this date; and it is further

ORDERED that defendant's motion to dismiss be and hereby is GRANTED for the reasons stated in the Court's Memorandum Opinion issued on this date; and it is further

ORDERED that plaintiffs' motion for a preliminary injunction be and hereby is DENIED as moot.