**CENTER FOR LAW AND EDUCATION, et al.,**
**Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF EDUCATION, Defendant.**

**No. CIV.A. 02–2414(JDB).**

United States District Court, District of Columbia.

March 26, 2004.

16

David Block Bergman, Ida Louise Bostian, Arnold & Porter, Washington, for Plaintiffs.

John Russell Tyler, U.S. Department of Justice, Washington, for Defendant.

### MEMORANDUM OPINION

BATES, District Judge.

Two advocacy groups and a parent of two public school students (collectively, "plaintiffs") challenge the composition of a negotiated rulemaking committee assembled by the Department of Education ("Education") to propose regulations as required by the No Child Left Behind Act, Pub.L. No. 107–110, 115 Stat. 1425 (2002) (codified at 20 U.S.C. § 6301 *et seq.*) ("NCLBA"). This action is plaintiffs' second attack on Education's selection of committee members. Earlier, plaintiffs sought a temporary restraining order to prevent the negotiated rulemaking committee from convening, and then a preliminary injunction of the rulemaking process until a new committee could be appointed. This Court dismissed that action because it found (1) that plaintiffs' claims were not yet justiciable in the absence of final agency action, *see Ctr. for Law & Educ. v. Dep't of Educ.,* 209 F.Supp.2d 102, 110–11 (D.D.C.2002) (*"Ctr. for Law & Educ. I "*), and (2) that the Negotiated Rulemaking Act, 5 U.S.C. § 561 *et seq.* ("NRA"), as incorporated into Section 1901 of the NCLBA, barred judicial review of Education's committee-member selections, at least before the conclusion of the rulemaking process, *see id.* at 106–10.

Now that final rules have been promulgated, plaintiffs renew their contention that the negotiated rulemaking committee did not adequately represent parents' and students' interests. Specifically, plaintiffs object to Education's designation of some educators as representatives of parents and students, given NCLBA's command that Education select committee members "in such numbers as will provide an equitable balance between representatives of parents and students and representatives of educators and education officials." NCLBA § 1901(b)(3)(B) (codified at 20 U.S.C. § 6571(b)(3)(B)). The advocacy group plaintiffs maintain that Education's alleged failure to constitute an appropriately balanced committee violates the procedural rights bestowed on them by the NCLBA, hinders their pursuit of a quality education for all students, and requires them to expend substantially more resources to meet their policy goals. *See* Compl. ¶¶ 14–15. Plaintiff Rachel Lindsey ("Lindsey"), whose children attend a school that receives federal funds under the NCLBA, asserts that Education's selection violated her procedural rights, resulting in the inadequate representation of her and her children's viewpoints. She claims that Education's resulting regulations on standards and assessments directly harm her and her children's interest in a quality education. *See id.* ¶ 16. In sum, plaintiffs argue that Education's selection of the committee was unlawful under section 1901(b)(3)(B), "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), and that a new committee should be convened because the regulations promulgated pursuant to the committee's recommendations are the result of a procedurally defective process.

Four motions are presently before the Court: defendant's motion to dismiss or for summary judgment, plaintiffs' FED. R. CIV. P. 56(f) motion to defer consideration of summary judgment pending further discovery, plaintiffs' motion to compel production of certain documents listed on defendant's privilege log, and defendant's motion to stay plaintiff's motion to compel discovery pending the adjudication of defendant's motion to dismiss. Because the Court finds that plaintiffs lack standing to pursue their claims under Article III of

the Constitution, and that Section 570 of the NRA bars judicial review of Education's selection of committee members, defendant's motion to dismiss shall be granted. The remaining motions shall therefore be denied as moot.[1]

## BACKGROUND

The advocacy group plaintiffs, the Center for Law and Education (CLE) and Designs for Change (DFC), are nonprofit organizations that claim to represent the interests of parents and students in educational matters. *See* Pls.' Rule 56(f) Mot. at 6. Both have long records of promoting parental involvement in education and the overall improvement of the educational system, especially on behalf of low-income students. Neither organization claims to sue on behalf of its members.[2] Lindsey's two children are students at John Foster Dulles Elementary School in Chicago, Illinois. Dulles Elementary has been identified as a "school in need of improvement" under the NCLBA. *Id.*

The NCLBA, which was signed into law in January 2002, provides support for education programs designed to help disadvantaged children meet high academic standards. Section 1901 of the NCLBA empowers the Secretary of Education to issue regulations under Title I of the Elementary and Secondary Act of 1965. Section 1901(b), entitled "Negotiated Rulemaking Process," lays out specific procedures for the Secretary to follow in developing and promulgating the regulations. First, the Secretary must "obtain the advice and recommendations of representatives of Federal, State, and local administrators, parents, teachers, paraprofessionals, members of local school boards and other organizations involved with the implementation and operation of programs under [Title I]." NCLBA § 1901(b)(1). After obtaining this advice, but before publishing proposed regulations, the Secretary is required to:

(A) establish a negotiated rulemaking process on, at a minimum, standards and assessments;

(B) select individuals to participate in such process from among individuals or groups that provided advice and recommendations, including representation from all geographic regions of the United States, in such numbers as will pro-

1. Plaintiffs' motions hinge on their purported need for additional discovery regarding Education's motives in selecting committee members and the degree to which viewpoints on the committee were balanced. For purposes of Education's motion to dismiss, however, the Court will accept plaintiffs' allegations that the rulemaking committee was inequitably balanced and that the interests of parents and students were not adequately represented. No further factual inquiry is therefore warranted.

2. It is unclear to what extent either of the advocacy groups has "members" in the sense of persons who "play[ ] any role in selecting [the group's] leadership, guiding its activities, or financing those activities." *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 26 (D.C.Cir. 2002). On its website, CLE does invite persons to join its "Community Action for Public Schools" network as "members." *See* Welcome to Community Action for Public Schools, *available at* http://www.cleweb.org/caps.htm (last visited Mar. 26, 2004). For a contribution, members have access to personalized advice from CLE about advocating for school improvement, receive a discount on CLE's literature, may access a password-restricted web page, and receive a newsletter. Any role such members play in selecting CLE's leaders or guiding its activities, however, is unstated. Similarly, DFC does not seem to be a "membership" organization. Its staff personnel offer workshops and other support for local school authorities and others engaged in education policy reform. *See* http://www.designsforchange.org/index.html (last visited Mar. 26, 2004); Pls.' Opp'n Ex. 2 (Decl. of Donald Moore).

vide an equitable balance between representatives of parents and students and representatives of educators and education officials; and

(C) prepare a draft of proposed policy options that shall be provided to the individuals selected by the Secretary under subparagraph (B) not less than 15 days before the first meeting under such process.

*Id.* § 1901(b)(3). Section 1901(b)(4) further directs that the negotiated rulemaking process:

(A) shall be conducted in a timely manner to ensure that final regulations are issued by the Secretary not later than 1 year after the date of enactment of the No Child Left Behind Act of 2001; and

(B) shall not be subject to the Federal Advisory Committee Act, but shall otherwise follow the provisions of the Negotiated Rulemaking Act of 1990 (5 U.S.C. 561 et seq.).

Ten days after the NCLBA was signed into law, Education published a notice soliciting advice and recommendations from interested parties including "States and local administrators, parents, teachers, paraprofessionals, members of local boards of education … civil rights groups, test publishers, and faith-based organizations with educational expertise." Request for Advice and Recommendations on Regulatory Issues, 67 Fed.Reg. 2770 (January 18, 2002). Consistent with Section 1901(b), the notice provided that a negotiated rulemaking committee would be selected from among individuals or groups who had submitted advice and recommendations, and that the committee would, at a minimum,

address issues concerning standards and assessment. *See* 67 Fed.Reg. at 2771. Purportedly to "convene a diverse negotiating group" to represent "a wide range of interests," Education also solicited nominations to the rulemaking committee from over seventy organizations. 67 Fed.Reg. 9223 (February 28, 2002).

After more than one hundred parties (including the advocacy group plaintiffs) had submitted recommendations, Education published a notice with the names of persons selected to participate in the negotiated rulemaking committee. No representatives of the advocacy group plaintiffs were selected. *See* 67 Fed.Reg. at 9223–24. In the end, as set forth in the notice, the committee included six representatives of state administrators and state boards of education; four representatives of local administrators and local school boards; three representatives of principals and teachers; one representative of business interests; two representatives from Education; and seven individuals "[r]epresenting students (Including At-risk Students, Migrant Students, Limited English–Proficient Students, Students with Disabilities, and Private School Students)." *Id.* at 9224.[3] Of the seven individuals set forth as representatives of students, two were described in the notice simply as "parent[s]," one was identified as a "teacher," and four appeared to be state or local education officials. *See id.*

On March 8, 2002, plaintiffs[4] sued to enjoin the negotiated rulemaking process until a new committee could be appointed, and to prohibit Education from using any rules proposed by the committee as it was

---

**3.** Education later issued a notice of correction in the Federal Register adding one individual as a representative of "principals and teachers." Notice of Meeting to Conduct a Negotiated Rulemaking Process; Correction, 67 Fed.Reg. 9935, 9936 (March 5, 2002).

**4.** The National Coalition for the Homeless and the National Law Center on Homelessness and Poverty, plaintiffs in *Ctr. for Law & Educ. I,* are not parties to this case.

then constituted. The committee was unlawfully composed, argued plaintiffs, in that it failed to achieve an equitable balance between representatives of parents and students on the one hand and representatives of educators on the other. *See* NCLBA § 1901(b)(3)(B). After denying temporary emergency relief, this Court ultimately dismissed plaintiffs' complaint. *Ctr. for Law & Educ. I,* 209 F.Supp.2d at 119. The Court concluded that, prior to Education's promulgation of final rules, there was no final agency action subject to judicial review, *id.* at 110–111, and the NRA barred review of Education's selection of committee members, *id.* at 106–10.

Meanwhile, the negotiated rulemaking process continued. On March 11, 2002, at the committee's first meeting, the two advocacy group plaintiffs were among several groups that appeared and petitioned unsuccessfully to be added to the committee. They had the support only of the two committee members who had been named solely in their capacity as "parents." *See* Pls.' Opp'n Ex. 4 (Decl. of Minnie Pearce). That notwithstanding, at least one representative of CLE remained and made brief comments relating to certain sections of the proposed rules, as all members of the public were invited to do. Pls.' Opp'n Ex. 1 (Decl. of Paul Weckstein). The committee went on to reach consensus on proposed rules, which were published for further comment. *See* 67 Fed.Reg. 30452

(May 6, 2002).[5] Again, the advocacy group plaintiffs submitted extensive recommendations and comments. *See* Pl.'s Opp'n Ex. 1, Attach. B.

Several of the proposed rules seem to have been of particular concern to the advocacy group plaintiffs. One, Section 200.3(a)(2) of the proposed rules, "permits a State to include in its assessment system either or both criterion-referenced assessments or nationally normed assessments." 67 Fed.Reg. 45038, 45045 (Jul. 5, 2002).[6] Plaintiffs oppose the use of norm-referenced assessments on the grounds that they "do not directly measure a child's proficiency in a particular subject, [and thus] they do not clearly demonstrate whether a student or school is adequately meeting minimum standards." Pls.' Opp'n at 11, Ex. 1. Declining to alter the rule as it had been proposed, Education responded to plaintiffs' concern:

> The Secretary has carefully considered these comments and believes the final regulations contain the proper amount of flexibility for States while requiring any State that uses only a nationally normed assessment at a particular grade to augment that assessment with additional items as necessary to measure the depth and breadth of the State's standards. Moreover, student results from an augmented nationally normed assessment must be expressed in terms of the State's achievement standards, not rela-

**5.** "Under the Committee's protocols, 'consensus' meant the lack of active objection by any Committee member on all issues within a regulatory section," and, according to Education, "[t]he Committee reached consensus on every issue in the draft regulations that were the subject of its negotiations." *Id.* at 30452–53. Although she does not deny voting in favor of the proposed regulations, one representative of parents on the committee now claims that she "probably would have opposed more of the proposed regulations" had she understood the committee's discussions

more completely. *See* Pl.'s Opp'n Ex. 4. She claims to have felt "pressure . . . to consent so that the Committee would have a 'unanimous' decision." *Id.*

**6.** Plaintiffs distinguish the two types of assessments as follows: "Norm-referenced, as opposed to criteria-referenced—tests measure student performance against other students' performance, rather than against criteria of mastery of identifiable skills or knowledge." Pls.' Opp'n at 11.

tive to other students in the nation. The Secretary believes these provisions address the commenters' concerns and will ensure that, before a State includes a nationally normed assessment in its assessment system, the State carefully examines the alignment of the assessment with the State's standards and the extent to which the State must add items to fully address its standards. Moreover, if a State combines criterion-referenced and normed assessments, the State must demonstrate that its system has a rational and coherent design.

67 Fed.Reg. at 45045. Plaintiffs also took exception to Section 200.2(b)(7) of the proposed rules, which required that each state's annual assessments "[i]nvolve multiple up-to-date measures of student academic achievement, including measures that assess higher-order thinking skills and understanding of challenging content." 67 Fed.Reg. at 45040. In its comment to the proposed rule, CLE suggested that Education "make it clear that multiple measures means multiple ways of measuring or assessing the *same* proficiencies, in order to help assure the validity of the determination that students are or are not proficient." Pls.' Opp'n Ex. 1, Attach. B at 6–7 (emphasis original). Education chose not to make the suggested clarification on the ground that "multiple measures" could, consistently with the Act, mean either measures that differed in format or in the type of knowledge they tested. 67 Fed. Reg. at 45045. Additionally, as a more general criticism, CLE objected that the proposed regulations failed adequately to provide for parent and public participation in the development and revision of standards and assessments as required by the NCLBA. *See* Pls.' Opp'n Ex. 1 at ¶ 54; NCLBA § 1111(a)(1) ("any State desiring to receive a grant under this part ... shall submit to the Secretary a plan, developed ... in consultation with local educational agencies, teachers, principals, pupil services personnel, administrators ... other staff, and parents").

## ANALYSIS

Plaintiffs assert that Education's actions have injured them in two ways. First, they claim that the NCLBA created a statutory right in favor of parents and students to be represented equitably on the negotiated rulemaking committee, that Education denied that right to parents and students, and thus that plaintiffs have suffered concrete and particularized injuries sufficient to support standing. Pls.' Opp'n at 7. Second, plaintiffs claim that the final regulations, as influenced by Education's allegedly flawed process, directly harm their particularized interests. *Id.* at 10. Education denies that plaintiffs have standing to sue on either of these theories. As to the advocacy group plaintiffs, Education contends that the NCLBA gave them no right to participate in the negotiated rulemaking process; as to Lindsey, Education argues that she cannot show that Education's alleged procedural violation concretely injured any of her particularized interests. Additionally, Education maintains that the Court lacks jurisdiction to hear plaintiffs' claims because Section 570 of the NRA bars judicial review of "[a]ny agency action relating to establishing, assisting, or terminating a negotiated rulemaking committee." 5 U.S.C. § 570.

### A. Applicable Legal Standard

"For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *accord Haase v. Sessions*, 835 F.2d 902, 906 (D.C.Cir.1987). A

motion to dismiss for lack of subject-matter jurisdiction under FED. R. CIV. P. 12(b)(1) should not prevail "unless plaintiffs can prove no set of facts in support of their claim which would entitle them to relief." *Kowal v. MCI Commun. Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994); *Beverly Enters., Inc. v. Herman*, 50 F.Supp.2d 7, 11 (D.D.C.1999). At this juncture, plaintiffs enjoy all favorable inferences that can be drawn from the alleged facts. *See E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C.Cir.1997).

That notwithstanding, the Court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," and plaintiffs bear the burden of pleading a claim within the Court's subject-matter jurisdiction. *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F.Supp.2d 9, 13 (D.D.C.2001); *see also Pitney Bowes, Inc. v. United States Postal Serv.*, 27 F.Supp.2d 15, 18 (D.D.C.1998). The Court may consider material other than the allegations of the complaint in determining whether it has jurisdiction to hear the case. *See, e.g., St. Francis Xavier Parochial Sch.*, 117 F.3d at 624–25 n. 3; *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C.Cir.1992); *Haase*, 835 F.2d at 906; *Hohri v. United States*, 782 F.2d 227, 241 (D.C.Cir.1986).

### B. Standing

To have standing to bring this action, "at an irreducible constitutional minimum," plaintiffs must establish three things: first, that they have suffered an injury-in-fact—an actual or imminent invasion of a legally protected interest which is concrete and particularized, not conjectural or hypothetical; second, that their injury was caused by, or is fairly traceable to, Education's alleged unlawful conduct; and third, that their injury is likely to be redressed by a favorable decision of this Court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *see also Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S.Ct. 1717, 109 L.Ed.2d 135 (1990); *City of Waukesha v. EPA*, 320 F.3d 228, 233 (D.C.Cir.2003); *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C.Cir.2002). "This set of criteria implements Article III by limiting judicial intervention to only those disputes between adverse parties that are in a form capable of judicial resolution." *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C.Cir.1996) (internal citations omitted).

 The constitutional requirements for standing apply equally to suits brought by organizational plaintiffs. *Common Cause v. FEC*, 108 F.3d 413, 417 (D.C.Cir. 1997) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982)). However, organizational plaintiffs may demonstrate standing in two ways: the group may have standing to sue on its own behalf "to vindicate whatever rights and immunities the association itself may enjoy," or, under proper conditions, it may have standing to assert its members' individual rights. *Warth*, 422 U.S. at 511, 95 S.Ct. 2197. Where an organization sues on its own behalf, it must establish "concrete and demonstrable injury to the organization's activities—with [a] consequent drain on the organization's resources—constituting ... more than simply a setback to the organization's abstract social interests .... Indeed, the organization must allege that discrete programmatic concerns are being directly and adversely affected by the challenged action." *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1433 (D.C.Cir.1995). To sue on behalf of its members, on the

other hand, the organization must demonstrate that "(a) its members would otherwise have standing to sue in their own right, (b) the interests it seeks to protect are germane to the organization's purpose, and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

### 1. CLE and DFC

■ The advocacy group plaintiffs in this case claim to sue on their own behalf "[a]s organizations that represent parents and students and that provided advice prior to the constitution of the Committee." Pls.' Opp'n at 9; *see also id.* at 14. They claim to have suffered two kinds of injury-in-fact. First, they contend that Education's "failure to seat an equitably balanced Committee meant that there were fewer seats for representatives of parents and students," and thus that their statutory procedural right to representation was denied, causing them direct injury. *Id.* Second, they argue that the regulations that emerged from the allegedly unrepresentative process have "made it more difficult for them to pursue their mission of assisting parents in holding their schools accountable and in getting the best quality education for students." *Id.* at 14 (citing *Metro. Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise, Inc.,* 501 U.S. 252, 264–65, 111 S.Ct. 2298, 115 L.Ed.2d 236 (1991)). The Court concludes, however, that CLE and DFC do not have constitutional standing to sue on either theory.

■ As to their claim of procedural injury, CLE and DFC stumble at the first step of the standing analysis. It is settled that "a plaintiff may have standing to challenge the failure of an agency to abide by a procedural requirement only if that requirement was designed to protect some threatened concrete interest of the plaintiff." *Florida Audubon Soc'y,* 94 F.3d at 664; *see also Common Cause,* 108 F.3d at 417 (when suing on its own behalf, an organizational plaintiff may only "vindicate whatever rights and immunities the association itself may enjoy"). Section 1901 of the NCLBA contains no requirement that advocacy groups be represented on the negotiated rulemaking committee. It does require that Education strike an "equitable balance between representatives of parents and students and representatives of educators and education officials." NCLBA § 1901(b)(3)(B). But it is plainly the interests of parents and students, and not of their representatives, that the equitable balance requirement ultimately seeks to protect. *See* 20 U.S.C. §§ 6301(8), (12). Additionally, assuming that parents and students are "a discrete, stable group of persons with a definable set of common interests" regarding education policy, *Am. Legal Found. v. FCC,* 808 F.2d 84, 89–90 (D.C.Cir.1987), and accepting as true the advocacy group plaintiffs' assertion that they effectively represent those interests, CLE and DFC would not as a consequence of that representation have standing to bring this challenge on their own behalf. Neither the advocacy group plaintiffs' participation in the rulemaking process nor their professed agenda of representing parents and students confers on them any particularized, legally-protected interest in having their organizational viewpoints represented on the committee. Simply put, it is not the interests of advocacy groups the statute protects, but rather those of parents and students.

The advocacy groups' second alleged injury also fails to suffice for standing. To sue on their own behalf for the alleged impact of the final rules, CLE and DFC

must demonstrate that Education's regulations as promulgated do "concrete and demonstrable injury to [their] activities;" a mere "setback to the organization[s'] abstract social interests" is inadequate to establish standing. *Havens Realty*, 455 U.S. at 379, 102 S.Ct. 1114. An "organization must allege that discrete programmatic concerns are being directly and adversely affected by the challenged action." *Id.* (internal citations omitted). Furthermore, "the injury alleged cannot be conjectural or hypothetical, remote, speculative, or abstract; rather it must be certainly impending." *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C.Cir.1996) (internal citations omitted).[7] "[C]onflict between a defendant's conduct and an organization's mission is alone insufficient to establish Article III standing ... [and][f]rustration of an organization's objectives is the type of abstract concern that does not impart standing." *Id.* at 1430. Here, Education's final rule does not injure the organizational plaintiffs in the required sense; it does no more than arguably offend their policy goals. Even viewed in the light most favorable to CLE and DFC, the facts do not support their allegation that Education's final rule "has made it more difficult for them to pursue their mission of assisting parents in holding their schools accountable and in getting the best quality education for students," Pls.' Opp'n at 14, in any discrete, programmatic way. CLE and DFC are not, for instance, forced to undertake costly measures to bring themselves into compliance with the regulations, *see City of Waukesha*, 320 F.3d at 234, nor have they shown that the regulations themselves impact the conduct of their advocacy activities, *Havens Realty*, 455 U.S. at 379, 102 S.Ct. 1114.

Instead, the regulations merely elect policies other than those advocated by CLE and DFC. For example, they permit states to use norm-referenced exams under certain conditions, adopt a definition of "multiple measures" other than the one advocated by CLE and DFC, and give the states more flexibility than CLE and DFC would like with respect to parental consultation. It may be that these policy choices will ultimately require CLE and DFC to raise and spend more money in pursuit of their objectives. Without concrete and demonstrable injury to the groups' activities, however, evidence of a drain on the organizations' resources does not amount to an injury-in-fact for standing purposes. *See Nat'l Taxpayers Union*, 68 F.3d at 1433. As Education notes, an organization's expenses in the pursuit of its agenda "are self-effectuating and [claiming them as injury-in-fact] would allow any advocacy group to manufacture standing by choosing to expend resources to advocate against policy decisions made by the federal government." Def.'s Rep. at 8; *see also Fair Employment Council of Greater*

---

7. Plaintiffs emphasize that, where a procedural violation is asserted, the imminence requirement is applied to the procedural violation, not to any discrete injuries that might someday flow from the alleged violation. *See Lujan*, 504 U.S. at 573 n. 7, 112 S.Ct. 2130. Here, however, plaintiffs allege distinct injuries resulting from the policy choices embodied in the final rule. Pls. Opp'n at 10–11, 14 ("The final rule promulgated by the Secretary hinders CLE's and DFC's organizational missions in many ways."). To the extent that these injuries are proffered as independent bases for standing, plaintiffs must show that such injuries do concrete and demonstrable harm to their activities. *Havens Realty*, 455 U.S. at 379, 102 S.Ct. 1114. As to plaintiffs' alleged procedural injury, it should be noted that *Lujan* extends the relaxed imminence analysis sought by plaintiffs only to "[t]he person who has been accorded a procedural right to protect his concrete interests." 504 U.S. at 573 n. 7, 112 S.Ct. 2130. The NCLBA accords CLE and DFC no procedural right to representation on the negotiated rulemaking committee.

*Washington, Inc. v. BMC Marketing Corp.*, 28 F.3d 1268, 1277 (D.C.Cir.1994) ("By this logic, the time and money that plaintiffs spend in bringing suit against a defendant would itself constitute a sufficient 'injury-in-fact,' a circular position that would effectively abolish the requirement altogether.").

Furthermore, even had CLE and DFC suffered an injury flowing specifically from the policy choices embodied in the regulations, it is unclear whether such injury would be traceable to Education's actions in assembling the negotiated rulemaking committee or would be redressable by this Court. As CLE and DFC recognize, the allegedly injurious effect of the rules on educational policy depends in large measure on the choices of actors not before the Court—the states. *See* Pls.' Opp'n at 14–15. Here, an adequate causal chain for purposes of standing must contain at least two links: one connecting the alleged imbalance of the committee to the rule promulgated, and another connecting the rule to plaintiffs' particularized injury. *Florida Audubon Soc'y*, 94 F.3d at 664; *see also City of Waukesha*, 320 F.3d at 234. It is plausible that a reconstituted committee would recommend different rules, and that the Secretary of Education, despite his stated policy preferences,[8] would adopt such rules were they recommended to him with the consensus that characterized the suggestions of the committee as it was

constituted. Tying the existing rules to the alleged organizational harms is more difficult, however. The NCLBA purposefully devolved significant discretion to state and local authorities for the formulation of standards and assessments.[9] Plaintiffs' hypothesized need to bring case-by-case challenges to state rules promulgated pursuant to the NCLBA, *see* Pls.' Opp'n at 14, would not necessarily be alleviated by a decision from this Court in their favor. Indeed, their hypothesis illustrates the importance of the independent (and largely still unrealized) role of state and local authorities in shaping the standards and assessments of which plaintiffs presently complain. In this action, the Court could afford relief only against Education: the Secretary could be ordered to reconvene the negotiated rulemaking committee with a greater number of persons chosen solely in their capacity as parents. But this would not remedy CLE's and DFC's alleged injury unless the states were thereafter bound to adopt a specific set of standards and assessments conforming to plaintiffs' policy preferences. *See Lujan*, 504 U.S. at 569, 112 S.Ct. 2130. That, however, would be inconsistent with the purposes and design of the NCLBA. *See* 20 U.S.C. § 6301(4).

In sum, neither the alleged imbalance of the committee nor the substance of the NCLBA regulations cause CLE or DFC

---

**8.** Education notes that the Secretary has staked out a position on issues such as norm-referenced testing that is contrary to plaintiffs' and that he is unlikely to change his mind. Def.'s Mot. at 12. Education furthermore notes that CLE and DFC "were heard by the Secretary at the negotiated rulemaking stage and later during the APA's notice-and-comment process ... the Secretary specifically considered [their] comments on such issues as norm-reference testing and explained why he disagreed with [their] position on these issues." Def.'s Rep. at 11.

**9.** "[T]he Department intends to issue regulations only where absolutely necessary: for example, where the statute requires a regulation or where a regulation is necessary to provide flexibility or clarification for State and local educational agencies .... This guidance can inform schools, parents, school districts, States, and other affected parties about the flexibility that exists under the statute, including multiple approaches that may be available in carrying out the statute's requirements." 67 Fed.Reg. at 2770.

an injury-in-fact that is fairly traceable to Education's actions and redressable by an order of this Court. The organizational plaintiffs therefore lack standing to bring this action.

### 2. Lindsey

█ Plaintiff Lindsey, as the parent of two students whose school receives funds pursuant to the NCLBA, presents a closer case. She, too, alleges a pair of distinct injuries as grounds for standing, and at first glance these alleged injuries would seem to satisfy standing requirements. First, she charges that the NCLBA created a statutory right for her and her children's interests to be represented equitably on the negotiated rulemaking committee. Pls.' Opp'n at 7 (citing NCLBA § 1901(b)(1), (3)). She claims that denial of that right constitutes concrete and particularized injury: "concrete because its denial puts at risk specific interests that Congress intended to protect and particularized because it belongs to a discrete and legislatively defined class of individuals whose interests are uniquely affected by the outcome of the proceeding at issue." *Id.; see also Warth*, 422 U.S. at 500–01, 95 S.Ct. 2197; *Lujan*, 504 U.S. at 580, 112 S.Ct. 2130 (Kennedy J., concurring). Second, she argues that Education's final regulations increase the likelihood that her children will be deprived of the NCLBA's benefits and receive a low-quality education. Pls.' Opp'n at 13. She points specifically to the risk that her children will be inaccurately assessed by standardized tests developed without "multiple measures" as urged by CLE and DFC during the rulemaking process. *Id.*

Education denies that Section 1901 created any procedural rights on behalf of parents and students—or, for that matter, educators and other school officials—by

requiring that membership on the negotiated rulemaking committee be equitably balanced between representatives the two groups. Def.'s Rep. at 5. Rather, says the Department, the goal of the balance requirement was merely "to bring together representatives of affected parties early on in the rulemaking process in order to assist the Secretary expeditiously to promulgate final rules under Title I . . . and, hopefully, to avoid litigation." *Id.* As for Lindsey's second alleged injury, Education insists that Lindsey's actual complaint is with the allegedly low quality of Chicago public schools, and that the regulations cause neither particularized nor traceable harm to her interests or those of her children. Def.'s Rep. at 9–10.

Lindsey's first allegation of injury is intuitively forceful. It is beyond peradventure that parents have an important interest in participating with educators in the design and delivery of schooling. Moreover, the fact that all parents—indeed, all persons in the United States—are properly concerned with the development of effective educational standards does not, without more, render Lindsey's alleged injury unsuited to judicial review. *FEC v. Akins*, 524 U.S. 11, 24, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998) ("Often the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the Court has found 'injury in fact.'"); *United States v. SCRAP*, 412 U.S. 669, 688, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) ("To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread government actions could be questioned by nobody."). "The key requirement . . . is that the plaintiff have suffered his injury in a personal and individual way." *Animal Legal*

*Defense Fund v. Glickman,* 154 F.3d 426, 433 (D.C.Cir.1998).

■ The prior and much narrower question before the Court, however, is whether the NCLBA conferred on Lindsey an enforceable right to have the committee constituted in a certain way. *See Banzhaf v. Smith,* 737 F.2d 1167, 1169 (D.C.Cir. 1984) ("A plaintiff cannot claim standing based on violation of an asserted personal statutorily-created procedural right when Congress intended to grant that plaintiff no such right."); R. FALLON ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 153 (5th ed.2003) (where injury to statutory rights is alleged, "the injury required by Art. III may exist solely in virtue of statutes creating legal rights, the invasion of which creates standing") (quoting *Warth,* 422 U.S. at 500, 95 S.Ct. 2197). Whether the statute created that right depends principally on the intent of Congress, as would the existence of a private cause of action to enforce the right. *Nathan v. Smith,* 737 F.2d 1069, 1077 (D.C.Cir.1984) (citing *Borrell v. United States Int'l Communications Agency,* 682 F.2d 981, 986 (D.C.Cir.1982)); *see also Linda R.S. v. Richard D.,* 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973); *Valley Forge Christian College,* 454 U.S. at 487–88, 102 S.Ct. 752 (1982).

In discerning the intent of Congress, the Court begins with the plain words of Section 1901. *See Citizens Coal Council v. Norton,* 330 F.3d 478, 482 (D.C.Cir.2003). The NCLBA unambiguously empowered Education to "issue such regulations as are necessary to reasonably ensure that there is compliance with [Title I]." NCLBA § 1901(a). It required, however, that Education "obtain the advice and recommendations of representatives of Federal, State, and local administrators, parents, teachers ... members of local school boards" and others before publishing any proposed regulations. NCLBA § 1901(b)(1). Moreover, before issuing proposed regulations, Education was commanded to "establish a negotiated rule-making process on, at a minimum, standards and assessments," and to "select individuals to participate in that process from among individuals or groups that provided advice and recommendations, including representation from all geographic regions of the United States, in such numbers as will provide an equitable balance between representatives of parents and students and representatives of educators and education officials." NCLBA § 1901(b)(3).

It is manifest from the language of Section 1901 that Congress intended to require the representation of parents, teachers, and school administrators in the project of developing proposed regulations under the NCLBA. Section 1901 does not, however, expressly bestow upon any person an individual right to enforce his or her construction of an "equitably balanced" negotiated rulemaking committee, or any other procedural right vis-a-vis the Department of Education. Contrary to Lindsey's position, the obvious interest of parents in the content of educational policy does not, absent Congressional intent to do so, give her standing to bring this action. On a claim that her statutory rights were violated, the importance of Lindsey's interest and the concreteness and particularity of her alleged injury are beside the point if the relevant statutory scheme gives her no enforceable rights. *See Havens Realty,* 455 U.S. at 373, 102 S.Ct. 1114 (concluding, before turning to a consideration of plaintiffs' injuries, that 42 U.S.C. § 3612 created an explicit cause of action for all persons to sue for unlawful housing practices); *Sierra Club v. Morton,* 405 U.S. 727, 732, 92

S.Ct. 1361, 31 L.Ed.2d 636 (1973).[10] Nor does the bare fact that the interests of parents were to be equitably represented on the committee signal a Congressional intent to give individual parents enforceable rights under Section 1901. *See Dellums v. Smith,* 797 F.2d 817, 823 (9th Cir.1986) (no procedural right inferred from citizens' mere participation in the legislative enforcement scheme). Lindsey does not direct the Court to any evidence in the NCLBA's legislative history to indicate that Congress intended to create an enforceable right or cause of action under Section 1901. Instead, she offers a self-defeating citation to *Thornburg v. Gingles,* 478 U.S. 30, 63–67, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), claiming that "the injury in this case closely parallels the injury in vote dilution claims under Section 2 of the Voting Rights Act, which allows an individual member of a class to sue for injunctive relief if that class is being denied an equal opportunity to elect representatives." Pls.' Opp'n at 8. Yet Section 2 of the Voting Rights Act begins with precisely what is missing from Section 1901: a recognition that it is a remedy for "denial or abridgment of a right." 42 U.S.C. § 1973 (2004). Congress has given Lindsey no such right to enforce against Education for the alleged imbalance of the negotiated rulemaking committee.

Lindsey does not have standing to sue for her second alleged injury, either. Her allegation that Education's final rules "have greatly increased the risk that [her] children will receive a low-quality education," Pls.' Opp'n at 10, is hampered, at the outset, by the relative subjectivity of the interest she seeks to protect: a "high-quality education." In *Metcalf v. Nat'l Petroleum Council,* 553 F.2d 176 (D.C.Cir.1977), an interesting although clearly imperfect analogue to this case, a United States Senator claimed that the National Petroleum Council was unlawfully operating as a federal advisory committee because its membership was not "fairly balanced" as required by the Federal Advisory Committee Act. Metcalf, at the time the chairman of a Senate subcommittee on Minerals, Materials and Fuels, alleged that the Council was providing him with biased information, thus "impeding [him] in his efforts to develop the best possible legislative product." *Id.* at 185–86. In rejecting Metcalf's proposed injury-in-fact, the Court of Appeals focused on the "purely subjective nature of his asserted injury":

> There are no objective standards to determine when a legislative product is the "best" that it can be ... Were we to accept the pure subjectivity put forth by appellant Metcalf in his capacity as an individual legislator, the federal courts would become a forum for the vindication of value preferences with respect to the quality of legislation enacted by our national legislature.

*Id.* at 188; *see also Animal Legal Defense Fund,* 154 F.3d at 449–450 (Sentelle, J.,

---

**10.** In *Sierra Club,* the Court observed:

Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a personal stake in the outcome of the controversy as to ensure that the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial reso-

lution. Where, however, Congress has authorized public officials to perform certain functions according to law, and has provided by statute for judicial review of those actions under certain circumstances, the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff.

405 U.S. at 732, 92 S.Ct. 1361.

dissenting). While there are, in fact, comparatively reliable standards available to gauge students' educational attainment, the ideal of a "high-quality education" is capable of myriad understandings based on divergent value preferences. The choice of which standard to employ in defining a "high-quality" education is beyond the Court's competence.

Lindsey's more specific articulation of the alleged injury to her children's "high-quality education"—that Education's final rule increases the risk that her children will be incorrectly evaluated by standardized tests—borders on the hypothetical. *See Lujan*, 504 U.S. at 564, 112 S.Ct. 2130. Even adopting plaintiffs' position that norm-referenced tests and "multiple measures" are as species of exams superior to some of the other methods of evaluation permitted by the NCLBA, *see* Pls.' Opp'n Ex. 1 (Decl. of Paul Weckstein) at ¶¶ 50–51; Ex. 2 (Decl. of Donald Moore) at ¶¶ 23–24, Lindsey has not and probably could not show that the rule has put her children in danger of imminent harm. Neither the substance nor the context of any test that will actually be taken by Lindsey's children is presently before the Court. "Although 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Lujan*, 504 U.S. at 564 n. 2, 112 S.Ct. 2130.

Causation and redressability are also barriers to the adequacy of Lindsey's second alleged injury. The "independent action[s] of some third party not before the Court," *Simon v. Eastern Kentucky Wel-*

*fare Rights Org.*, 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), namely the Illinois State Board of Education, are Lindsey's principal grievance. Pls.' Opp'n at 13. It is true that the NCLBA regulations permit Illinois to adopt the kind of tests to which Lindsey objects. But she does not allege that Illinois would have been barred from adopting such measures but for the NCLBA regulations; nor is Illinois *required* by the regulations to adopt the kind of tests she opposes. Put another way, it may well be that "the regulations do not adequately promote the use of multiple measures," but it does not follow from that premise that Lindsey's children "are [therefore] at an increased risk of being inaccurately assessed." *Id.* Lindsey's argument on this score is essentially that the NCLBA should command something it does not: state adherence to a specific program of national standards and assessments. That argument is appropriately addressed to the legislature. Finally, even were it so disposed, the Court could not order the Illinois State Board of Education to rescind its system of assessments in this action. Pls.' Opp'n at 13. The final NCLBA rule has therefore caused Lindsey no cognizable injury within the scope of this Court's remedial powers.[11]

## C. Negotiated Rulemaking Act

■ Education asserts a second, independent bar to the exercise of jurisdiction in this case. As the Court has previously noted, *see Ctr. for Law & Educ. I*, 209 F.Supp.2d at 107–09, Section 1901(b)(4) of the NCLBA[12] incorporates Section 570 of

---

**11.** The Court does not reach plaintiffs' discussion of the "zone of interests" test, Pls.' Opp'n at 18–21, a prudential standing doctrine, because it finds that plaintiffs lack even constitutional standing. *See Bennett v. Spear*, 520

U.S. 154, 162, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997).

**12.** "[The negotiated rulemaking] process—(A) shall be conducted in a timely manner to ensure that final regulations are issued by the

the NRA. Education maintains that Section 570 "unambiguously applies in this case in which plaintiffs seek to challenge the establishment of the Secretary's negotiated rulemaking committee," and that it "eternally bars judicial review of a challenge to the establishment of an agency's negotiated rulemaking committee, at least in circumstances such as exist in this case." Def.'s Mot. at 14–15. In *Ctr. for Law & Educ. I*, this Court found that Section 570 barred judicial review of a challenge to the composition of the negotiated rulemaking committee before the promulgation of final rules. 209 F.Supp.2d at 110.[13] Left for another day was whether Section 570 precludes a party from challenging a final rule on the basis of an alleged defect in the establishment of a negotiated rulemaking committee, although the Court observed that Congress may not have intended that result. *Id.*

That question, apparently one of first impression,[14] is now presented. Again, the Court begins with the words of the relevant statute. *See Citizens Coal Council*, 330 F.3d at 482; *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("Our first step in

interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case. Our inquiry must cease if the statutory language is coherent and consistent."). In determining the "plainness or ambiguity of the statutory language," the Court turns to "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341, 117 S.Ct. 843; *see also United States v. Wilson*, 290 F.3d 347, 353 (D.C.Cir.2002).

Section 570 provides:

Any agency action relating to establishing, assisting, or terminating a negotiated rulemaking committee under this subchapter shall not be subject to judicial review. Nothing in this section shall bar judicial review of a rule if such judicial review is otherwise provided by law. A rule which is the product of negotiated rulemaking and is subject to judicial review shall not be accorded any greater deference by a court than a rule which is the product of other rulemaking procedures.

---

Secretary not later than 1 year after the date of enactment of the No Child Left Behind Act of 2001; and (B) shall not be subject to the Federal Advisory Committee Act, but shall otherwise follow the provisions of the Negotiated Rulemaking Act of 1990 (5 U.S.C. 561 et seq.)." 20 U.S.C. § 6511 (2004).

13. Plaintiffs' renewed contention that Section 570 applies only to the "process of the committee," and therefore not to the selection of committee members, remains unpersuasive. As an initial matter, it appears that the words "such process" in Section 1901(b)(4) apply not to the "process of the committee" as plaintiffs urge, but to the negotiated rulemaking process as a whole. Nor does the fact that the NCLBA mandates the establishment of a negotiated rulemaking committee alter the Court's analysis. *But see* Pls.' Opp'n at 23. That Congress here required, rather than

merely permitted, the use of negotiated rulemaking simply does not speak to how much of the NRA was incorporated into the NCLBA. More to the point, Congress did explicitly state that 5 U.S.C. § 565 would not apply to the NCLBA's negotiated rulemaking process. *See Ctr. for Law & Educ. I*, 209 F.Supp.2d at 107 n. 5. It could have made a similar exception for Section 570, but did not.

14. In dicta from *USA Group Loan Servs., Inc. v. Riley*, 82 F.3d 708, 714 (7th Cir.1996), Judge Posner suggested that Section 570 would prevent a challenge to an agency regulation based on the agency's alleged failure to negotiate in good faith during the negotiated rulemaking process. The Court has discovered no other cases addressing the effect of Section 570 on judicial review of a final agency regulation.

5 U.S.C. § 570. As Education points out, the plain language of the statute places no temporal or procedural limitation upon the bar to judicial review that it creates. Because Education's choice of participants in the negotiated rulemaking is an "agency action relating to establishing . . . a negotiated rulemaking committee," *id.*, Education maintains that plaintiffs' challenge should be barred. Plaintiffs respond that Congress could not have meant to preclude judicial review of a final rule based on an objection to "preliminary, procedural, or intermediate agency action not directly reviewable," as is available under the Administrative Procedures Act ("APA"). *See* 5 U.S.C. §§ 704, 706(2)(A). They rest on the second sentence of Section 570— "[n]othing in this section shall bar judicial review of a rule if such judicial review is otherwise provided by law"—and on the strong traditional presumption that final agency action is reviewable absent a clear expression of Congressional intent to the contrary. *See Bowen v. Michigan Acad. of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986).

An overarching goal of the NRA was "to reduce judicial challenges to regulations by encouraging the parties to narrow their differences in advance of the formal rulemaking proceeding." P. WALD, ADR AND THE COURTS: AN UPDATE, 46 Duke L.J. 1445, 1462–63 (1997);[15] *see also* Statement by President George Bush Upon Signing S. 303, 26 Weekly Compilation of Presidential Documents 1945 (Dec. 3, 1990) (reprinted in 1990 U.S.C.C.A.N. 6709-1) ("This Act will encourage Federal agencies to use negotiation in the regulatory process, to the extent that it may be appropriate, as a means of avoiding costly and time-consuming litigation."); C. COGLIANESE, ASSESSING CONSENSUS: THE PROMISE AND PERFORMANCE OF NEGOTIATED RULEMAKING, 46 Duke L.J. 1255, 1262–63 (1997) ("One of the most cited reasons for using negotiation has been its potential to ward-off judicial review challenges . . . . By seeking to resolve conflicts through a quest for a negotiated agreement, the agency in theory is supposed to save time during the rulemaking process as well as afterwards by avoiding litigation."). Reading Section 570 to multiply the grounds for attacking final rules would thus seem inconsistent with the spirit of the NRA.

It is also true, however, that Section 570 expressly preserves "judicial review of a rule if such judicial review is otherwise provided by law." To Education, this language means that parties aggrieved by a final rule may challenge it on any basis available under the APA *other than* the alleged flaws of the negotiated rulemaking process. That seems to make sense. Plaintiffs, however, contend that Section 570 may be read to shield agency actions relating to the establishment of the committee only until the promulgation of final rules; an error in the establishment of a negotiated rulemaking committee, like any preliminary misstep by the agency, would

---

15. Musing on the question presented in this case, Judge Wald commented that

[i]t could certainly be argued that if a negotiated rule subsequently went through the APA notice-and-comment process, and is not vulnerable to judicial challenge on any APA ground, any defects in the parties' preliminary promenade should be irrelevant. Obviously the APA itself provides no basis for invalidating such a rule, and the plain language of section 570 of the NRA can

hardly be read to do so either . . . . On the other hand, it could be argued that when Congress mandates a negotiation, the agency is not free to waste everyone's time by flouting its instructions . . . . The likelihood, however, that courts will go much beyond assuring that a required negotiation takes place and decide whether the agency was playing a bona fide role throughout, seems to me slim.

*Id.*

be reviewable upon the issuance of final rules.

As the Court has previously recognized, *see Ctr. for Law & Educ. I,* 209 F.Supp.2d at 110 n. 9, there is some support in the legislative history for plaintiffs' position. A report of the Senate Committee on Governmental Affairs explains that the NRA

> recognizes and maintains the long tradition in federal administrative law which authorizes judicial review of agency rules at the time those rules are promulgated. The [NRA] merely precludes judicial intervention in the earlier stages of the regulatory process, when a negotiated rulemaking is underway. The [NRA] precludes this judicial intervention, not to prevent courts from taking a hard look at an agency's rules, but to allow federal agencies the freedom of action needed to make decisions and take actions which will allow the negotiated rulemaking process to work.

S. REP. No. 101–97, at 28–29 (1989). A House report on the NRA, on the other hand, is plainly not favorable to plaintiffs' position, noting simply that "[a]gency decisions to establish a negotiated rulemaking committee or regarding the makeup of this [sic] membership are not subject to judicial review." H. REP. No. 101–461, U.S.Code Cong. & Admin.News at 6697, 6706 (1990). Neither piece of legislative history specifically addresses whether judicial review of a final rule promulgated through negotiated rulemaking may be based on an alleged flaw in establishing a negotiated rulemaking committee, in light of the plain language of Section 570 directing that such agency action "shall not be subject to judicial review."

Upon reflection, even in light of the legislative history adduced by plaintiffs, the Court concludes that Section 570 cannot be read as limited to barring judicial review of actions pertaining to the establishment of a negotiated rulemaking committee only before an agency's issuance of final rules. First, the Court reiterates that the plain language of the statute does not cabin its restriction of judicial review to the period before the promulgation of final rules—even though Congress could easily have expressed an intent to do so. *Cf. Northbrook Nat'l Ins. Co. v. Brewer,* 493 U.S. 6, 12–13, 110 S.Ct. 297, 107 L.Ed.2d 223 (1989) (declining to assume that Congress "intended anything more than it had stated in unambiguous terms" when it barred suits against insurers but not by insurers under 28 U.S.C. § 1332(c)). Second, as Education observes and plaintiffs do not dispute, the APA itself prohibits judicial review of intermediate challenges to the negotiated rulemaking process. Indeed, this Court so held in *Ctr. for Law & Educ. I.* Plaintiffs' proposed interpretation would render the first sentence of Section 570 redundant and is therefore disfavored. *See, e.g., Gutierrez de Martinez v. Lamagno,* 515 U.S. 417, 444, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995). Third, the NRA's design to provide alternatives to litigation seems to counsel against plaintiffs' interpretation, which would in effect give disgruntled parties an additional basis for attacking regulations produced through negotiated rulemaking. Agencies would have little incentive to convene negotiated rulemaking committees if doing so made their final rules more vulnerable to legal challenge. This conclusion accords no greater judicial deference to rules that flow from negotiated rulemaking—such rules remain subject to all other challenges on the same basis as other rules. It merely recognizes Congress' intent to bar judicial review of a narrow category of potential procedural flaws in the interest of more efficient rulemaking. Finally, Education notes that plaintiffs actively participated in the APA notice-and-comment

process and yet do not challenge the resulting rule on any basis other than the alleged inadequacy of the negotiated rulemaking committee. The interpretation of Section 570 adopted by the Court today does not foreclose the possibility that plaintiffs could successfully challenge Education's final rule on substantive grounds, or on procedural grounds relating to notice-and-comment rulemaking typical of APA cases.

■ Although the Supreme Court has maintained a strong presumption in favor of the reviewability of agency action, the general presumption is "not controlling where a congressional intent to preclude review at the behest of particular potential litigants is 'fairly discernible' in the statutory scheme as a whole or in the statute's legislative history." *Dellums*, 797 F.2d at 822 (quoting *Block v. Community Nutrition Institute*, 467 U.S. 340, 350, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984)). The Court finds that Education has rebutted the presumption in this case by making "a clear showing that judicial review would be inappropriate," *Doe v. Casey*, 796 F.2d 1508, 1513–14 (D.C.Cir.1986), to the extent it would be based on an alleged flaw in establishing the negotiated rulemaking committee, given the express command of Section 570.

### CONCLUSION

Because plaintiffs' lack constitutional standing and because Section 570 bars judicial review of agency action relating to the establishment of a negotiated rulemaking committee, Education's motion to dismiss shall be granted. All other motions presently before the Court shall be denied as moot. A separate order shall be issued.

### ORDER

Upon consideration of defendant's motion to dismiss or for summary judgment, plaintiffs' motion to defer consideration of summary judgment pending further discovery, plaintiffs' motion to compel production of certain documents listed on defendant's privilege log, defendant's motion to stay plaintiffs' motion to compel production, and the entire record in this case, and for the reasons stated in the memorandum opinion issued on this date, it is hereby

ORDERED that defendant's motion to dismiss is granted; and it is further

ORDERED that all other motions before the Court are denied as moot; and it is further

ORDERED that this case is dismissed in its entirety.